3IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **MAJOR MANUFACTURING & SUPPLY, L.L.C.** | § § § § § § § § § § § § § § § § | **CIVIL ACTION # 26-** |
| **Plaintiff,** | | |
| **v.** | | |
| **BENTON T. KNOBLOCH, JR.; BTK ENERGY, L.L.C.; TRI-TRAP, L.L.C.; TRI-STATE ENVIRONMENTAL, L.L.C.; DOWNHOLE RENTAL TOOLS, L.L.C.; and WELLX ENERGY, L.L.C.** | | **JURY TRIAL DEMANDED** |
| **Defendants.** | | |

## COMPLAINT

Comes now Plaintiff, **Major Manufacturing & Supply, L.L.C.** ("Major"), and respectfully represents:

### I.      PARTIES

1.      Plaintiff, Major, is a Louisiana limited liability company domiciled at 119 Exploration Road in Broussard, Louisiana.

2.      Defendant **Benton T. Knobloch, Jr.** is an individual residing in Lafayette, Louisiana.

3.      Defendant **BTK Energy, L.L.C.** ("BTK") is a Louisiana limited liability company owned by Mr. Knobloch and domiciled at his residence in Lafayette, Louisiana.

4.      Defendant **Tri-State Environmental, L.L.C.** ("Tri-State") is a Texas limited liability company domiciled in Monahans, Texas and having a principle place of business in Houma, Louisiana.

5.      Defendant **Tri-Trap, L.L.C.** ("Tri-Trap") is a Louisiana limited liability company

ORIGINAL COMPLAINT

PAGE 1

domiciled at Tri-State's offices in Houma, Louisiana.

6.    Defendant **Downhole Rental Tools, L.L.C.** ("Downhole") is a Louisiana limited liability company domiciled in Saint Martinville, Louisiana.

7.    Defendant **WellX Energy, L.L.C.** ("WellX") is a Louisiana limited liability company domiciled in Lafayette, Louisiana.

## II.    JURISDICTION AND VENUE

8.    This is an action for patent infringement pursuant to 35 U.S.C. Sec. 271; for claims under the federal Defend Trade Secrets Act, 18 U.S.C. 1836; and for related causes of action arising under Louisiana law, including but not limited to the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 et seq., and the Louisiana Uniform Trade Secrets Act, La. R.S. 51:1431-1439.

9.    Jurisdiction over this action arises from 28 U.S.C. secs. 1331 and 1338; from 18 U.S.C. Sec. 1836; and from the Court's supplemental jurisdiction over Plaintiff's state-law causes of action, 28 U.S.C. Sec. 1367.

10.    Venue is proper pursuant to 28 U.S.C. secs. 1400(b) and 1391(b) and (c) because a substantial portion of Defendants' activities giving rise to Plaintiff's claims occurred in this district.

## III.    FACTUAL BACKGROUND

A.    **Development and Contribution of the Romero Patents to WellX (April 2022)**

11.    Major and its principal, Cambre Romero, have for many years been in the business of developing, marketing, manufacturing, leasing, and selling tools for use in the oil and gas

**ORIGINAL COMPLAINT**

industry. Around 2015, Mr. Romero and his brother, Clayton Romero, began creating the filtration and diffuser technology at issue. Each of the following patents (collectively, the "Romero Patents") was co-invented by Cambre Romero and Clayton Romero, and either assigned to or applied for by Downhole, their vehicle for commercializing (among other things) novel filtration and diffuser technology:

12.    On August 21, 2018, U.S. Patent No. 10,053,960 (the "'960 Patent"), "Downhole Diffuser Assembly," issued to Downhole.

13.    On May 12, 2020, U.S. Patent No. 10,648,256 (the "'256 Patent"), "Diffuser Assembly," issued to the Romero brothers.

14.    On June 9, 2020, U.S. Patent No. 10,677,019 (the "'019 Patent), "Diffuser Assembly With Vibration Feature," issued to the Romero brothers.

15.    On February 23, 2021, U.S. Patent No. 10,927,646 (the "'646 Patent"), "Filter Assembly With Vibration Feature," issued to the Romero brothers.

16.    On June 29, 2021, U.S. Patent No. 11,047,181 (the "'181 Patent"), "Diffuser Assembly," issued to the Romero brothers.

17.    On October 14, 2025, U.S. Patent No. 12,442,265 (the "'265 Patent"), "Diffuser and Filter Assemblies With Magnetic Features," issued to Downhole.

18.    All of the Romero patents (attached hereto, *in globo*, as Exhibit A) are valid and are presumed valid under 35 U.S.C. Sec. 282.

19.    The inventions contained in the Romero Patents that Downhole did not already own (Downhole was the applicant on the '960 Patent and the '265 Patent) were assigned to Downhole effective as of that company's "merger agreement with WellX Energy," according to assignment filed July 6, 2023 at Reel 064165, Frame 0687 of the U.S. Patent and Trademark Office's patent

assignment records.[1]

20.    Downhole was owned 100% by the Romero brothers.  They contributed all of their interest in Downhole to the newly-formed WellX when that entity was formed in April 2022, via an entity they formed for that purpose, Romero Brothers, L.L.C.  The Romero Patents held by Downhole were thus part of Cambre and Clayton Romero's contribution to WellX, contributed to WellX in exchange for 50% of the membership interest in WellX being issued to their entity, Romero Brothers L.L.C. upon its formation.

21.    Upon its formation and in its Operating Agreement, WellX also agreed to purchase 100% of its equipment from Major, which was wholly-owned by Cambre Romero.[2]

22.    WellX was (and remains) owned in equal parts by the Romero brothers (via Romero Brothers, L.L.C.) and by SDBK Energy Partners, L.L.C. ("SDBK"). The latter company is a venture co-owned (or purported to be co-owned, upon information and belief) by defendant Benton Knobloch, Jr. and Stephen Domingue. SDBK's counterpart contribution to WellX upon WellX's formation was "all of the right, title, and interest" of Mason Specialty Tools, LLC.  Downhole and SDBK were referenced as the "Contributed Entities" in WellX's Operating Agreement; as set forth in that agreement, 100% of the membership interest of both entities was contributed to WellX upon its formation, as WellX was formed, and its Operating Agreement entered into, "to consummate a merger" between those entities.[3]

---

[1] Assignment attached as Exhibit B.

[2] Operating Agreement attached as Exhibit C.  The exclusivity arrangement is provided for on p. 7, at Sec. 5.3(b). The "Exclusive Supply Agreement" entered into pursuant to this provision, and executed the same day as the Operating Agreement, is attached as Exhibit J.

[3] Attached as Exhibit C.

**ORIGINAL COMPLAINT**

**B.      Business Development of "iTrap" Diffuser Filtration system for WellX (April 2022 - March 2023)**

23.    Cambre Romero and Stephen Domingue were (and are) WellX's managers comprising its Board of Managers, to which Mr. Knobloch reported as an employee and officer of WellX.

24.    Soon after WellX's formation, Mr. Knobloch began marketing to WellX customers BP and Halliburton WellX's "iTrap HPDU" (high-pressure debris unit) drilling-fluid filtration system. Correspondence[4] in June 2022 from Mr. Knobloch to numerous representatives at BP and Halliburton (including Chad Stelly, who later would work for Defendants with Mr. Knobloch) described WellX's iTrap system as "us[ing] iClean, Xternal Diffuser, and any version of a custom screen/filter we provide…"

25.    Mr. Stelly's exit from Halliburton was not voluntary; according to Mr. Domingue, he was forced out, and WellX forced to undergo an audit by Halliburton, after conduct of Mr. Knobloch involving Mr. Stelly raised ethical questions at Halliburton. Mr. Knobloch's alienation of a significant WellX customer inclined Mr. Domingue to desire Mr. Knobloch's firing from WellX. Mr. Domingue was placated, however, by WellX requiring that Mr. Knobloch personally contribute funding for continued engineering cost associated with iClean and the continued engineering cost and full manufacturing cost associated with iTrap.[5]

26.    "iClean" referred to filtration technology being developed by Mason before, and by WellX after, Mason's merger into WellX. "Xternal Diffuser" was Mr. Knobloch's marketing term for the diffuser technology contributed to WellX via Downhole in the Romero Patents.

---

[4] Attached as Exhibit D.
[5] Text messages between Stephen Domingue and Cambre Romero, September 2022, attached as Exhibit E.

**ORIGINAL COMPLAINT**

27.    In July 2022, Mr. Knobloch wrote[6] to a representative of Shell pitching WellX's downhole drilling-fluid filtration technology as superior in total cost to the less-durable and less-effective "standard screens/tools" Shell was then using. Mr. Knobloch marketed that WellX was then providing its diffuser and filtration solutions in surface applications, not only downhole.

28.    In December 2022, Mr. Knobloch forwarded[7] to Cambre Romero drawings prepared by David Tilley at Gonsoulin Engineering, the firm engaged by WellX to perform the engineering for iTrap, depicting a "prelim filter element arrangement" including "a 'smart' screen with emergency bypass" for the WellX product to be called "iTrap XL." The title block used by Mr. Tilley in the forwarded drawings demonstrates the emergency-bypass design was prepared for WellX.

29.    A few days later in December 2022, Mr. Knobloch reported[8] to Cambre Romero and Mr. Domingue that Halliburton was interested in and would shortly be viewing WellX's iTrap product.

30.    In January 2023, one day after he showed them the device, Mr. Knobloch forwarded[9] to Halliburton representatives presentation slides depicting a skid-mounted iTrap surface unit, including references to "magnets [and] diffusers" and an "emergency-bypass 'smart' screen feature," with updated drawings prepared for WellX by Gonsoulin Engineering. These materials were designated "confidential and privileged," and Mr. Knobloch in his correspondence explicitly asked Halliburton's Bryant Gautreaux and Ian Moity to "keep this information confidential." At

---

[6] Correspondence between Benton Knobloch and Shell's Suheyl Ozyigit, including iClean and iTrap overview slide deck, attached as Exhibit F.

[7] Correspondence between Benton Knobloch and Cambre Romero, December 8, 2023, attached as Exhibit G.

[8] Attached as Exhibit H.

[9] Attached as Exhibit I.

**ORIGINAL COMPLAINT**

that time, a further "yard" or field trial of the skid-mounted iTrap unit was scheduled for Halliburton in Port Fourchon.

31.     Several days later in January 2023, Mr. Tilley provided Clayton Romero, who was operational head of manufacturing for Major, with updated drawings for the "emergency-bypass 'smart' screen" that was part of WellX's iTrap XL.  Major was the exclusive supplier of WellX, and Clayton was co-owner of Romero Brothers, L.L.C., one of WellX's Members.

32.     In February 2023, Mr. Knobloch forwarded to Clayton Romero for manufacturing completed drawings by Mr. Tilley of "magnet elements" for use with WellX's iTrap system. These drawings, dated February 1, 2023 the name of Mason, one of the "Contributed Entities" and a wholly-owned subsidiary of WellX, in the title block.

33.     On February 28, 2023, Mr. Tilley supplied[10] to Mr. Knobloch and Clayton Romero updated drawings for iTrap XL's "smart" screens, including diameter accommodations for the Romero Patents' diffuser blades. On March 1 and 2, 2023, Mr. Tilley supplied[11] to WellX additional sets of drawings for an iTrap bladed magnetic diffuser. The final drawings for the iTrap diffuser again bore Mason's name in their title block.

## C.     Planned Diversion of WellX Intellectual Property: the '269 Patent (January 2023)

34.     Prior to being contributed in its entirety to WellX, Mason had, on January 24, 2022, filed provisional patent application No. 63/302,297. As one year from that application's filing approached, Mason's patent counsel Jesse Lambert notified Mr. Knobloch and Mr. Domingue (who had controlled Mason before the merger) in January 2023 that a non-provisional application

---

[10] Attached as Exhibit K.

[11] Attached as Exhibit L.

**ORIGINAL COMPLAINT**

would need to be filed to preserve Mason's rights.

35.    However, Mr. Domingue and Mr. Knobloch apparently did not inform Mr. Lambert that neither they nor SDBK controlled the intellectual property of Mason any longer.  Mason was now 100% owned by WellX, and the management of Mason and its property was now under the exclusive control and authority of WellX's Board – which acted exclusively by the unanimous consent of Cambre Romero and Stephen Domingue, not either of them individually.

36.    Despite this, Mr. Lambert was instructed, presumably by Mr. Knobloch, to file a non-provisional application on behalf of Mason listing solely Mr. Knobloch as inventor.

37.    Plaintiff learned of the non-provisional application by Mason only when it published, in July 2023, as No. 18/100,905. That latter application ripened ultimately into U.S. Patent No. 12,571,269, issued March 10, 2026 (the "'269 Patent").

38.    Such matter as is contained in the '269 Patent and was disclosed in Mason's then-pending provisional application was assigned to WellX, via Mason, and remains owned and controlled by WellX. Further, such matter as may have been contributed to the subsequent non-provisional application by Mr. Knobloch was conceived within the scope of his employment by WellX, and likewise remains owned by WellX.

**D.    Planned Diversion of WellX Intellectual Property and Business Opportunities: iTrap and the Romero Patents (March - June 2023)**

39.    Filing the application that would ripen into the '269 Patent in Mason's name – without either the knowledge or consent of the Board of Managers of WellX (and thus *ultra vires*) - was not the only activity Mr. Knobloch undertook in early 2023 to WellX's detriment.

40.    Halliburton trialed the iTrap skid-mounted surface unit in Port Fourchon in March 2023.  The results were uniformly and overwhelmingly positive; WellX's customers were excited

**ORIGINAL COMPLAINT**

for the new product.  Nonetheless, around that same time – according to the date of registration, apparently immediately or shortly after the demonstration and/or receiving feedback about it from Halliburton, Mr. Knobloch organized and formed[12] defendant Tri-Trap to commercialize for himself the technology he had, until now, been purporting to develop and market on behalf of WellX, but apparently had decided to misappropriate from WellX.

41.    Mr. Knobloch included as members or managers in Tri-Trap, along with his own alter ego BTK[13], partners he had apparently already recruited even before iTrap's customer demonstration: defendant Tri-State Environmental (an existing provider of labor and oilfield cleaning services) as well as Tri-State's principals, Judy and Scott Carter.

42.    Mr. Knobloch had previously been in touch with Tri-State *on behalf of WellX* (and charged a meal with Tri-State representatives to WellX)[14] to deploy iTrap, but at some point diverted that Tri-State opportunity from WellX to himself.

43.    In June 2023, Mr. Knobloch sent[15] to WellX's Halliburton contact, Mr. Gautreaux, a "WellX iTrap XL" slide deck Mr. Knobloch had updated to bear Tri-State's logo on every page. Mr. Knobloch was circulating this iTrap promotional material via, and above, a WellX electronic-mail signature and still forwarding it to Clayton Romero as WellX business.

**E.    Licensure of Romero Patents and WellX Technology to Major (July 2023)**

44.    Despite Mr. Knobloch's promotion of WellX's iTrap system to customers in its early

---

[12] Louisiana Secretary of State registration information for Tri-Trap, L.L.C. attached as Exhibit M.

[13] Mr. Knobloch organized BTK on April 4, 2022, three days after the merger into WellX of Mason and Downhole.

[14] Expenses reimbursement request for January 21, 2023 attached as Exhibit N.

[15] Correspondence 6/5/2023 as Exhibit O.

**ORIGINAL COMPLAINT**

stages of commercialization (Pars. 23-30), WellX was internally divided on its prospects. Mr. Domingue believed the technology's prospects for downhole development outweighed those for its use in surface applications. By contrast Cambre Romero, who with his brother had developed the diffuser technology central to iTrap, believed iTrap (including Mason's "iClean" technology as well as the Romero Patents) had greater promise above the surface than below.

45.     On October 20, 2022, Mr. Benton wrote to Mr. Domingue and the Romero brothers noting, among other things, his impression that "it seemed no one had the interest to move forward" with iTrap skids for land use, and offering to "move forward with it individually if needed" for offshore use.[16]  Mr. Knobloch reiterated those comments in an email of October 26, 2022, saying "I just need to know so I can get things set up alternatively."[17]

46.     In fact, if WellX ultimately did not pursue the opportunity, then Cambre Romero planned to develop and pursue it. It was based almost entirely on the iTrap technology that the Romero brothers and Downhole had contributed to WellX, and he had long been aware of the potential for a surface solution based upon it.

47.     Accordingly, Mr. Romero replied[18] to Mr. Knobloch's email of October 26 asking order to meet personally, and, when they did so, he reminded Mr. Knobloch that neither he nor anyone else could develop and sell iTrap technology without WellX's authorization.

48.     As Major, an entity wholly-owned by Mr. Romero, had a greater interest in using the technology to develop surface applications than did WellX, which could only act by the unanimous consent of its Board (including the less-enthusiastic Mr. Domingue), in September 2022 WellX

---

[16] Correspondence of 10/20/2022 attached as Exhibit P.

[17] Correspondence of 10/26/2022 attached as Exhibit Q.

[18] Further correspondence of 10/26/2022 attached as Exhibit R.

**ORIGINAL COMPLAINT**

**PAGE 10**

(through Mr. Domingue and Cambre Romero, acting unanimously as its Board of Managers) agreed[19] to license to Major all of its technology, including specifically WellX's "patented diffusion and filtering systems and related technology," for use on the surface, and to execute an appropriate licensing agreement memorializing same.

49.   WellX executed effective July 1, 2023 a thoroughgoing license to Major (the "License Agreement")[20] for the Romero Patents (including the '265 Patent not yet issued), "as well as all other intellectual property and technology of Licensor or to which Licensor (individually or collectively) may own rights (including in all other diffuser and filtering technology and systems, all variations thereof and technology related thereto including all iClean systems inclusive of the iClean debris management system… in all case[s] only in, and as limited to, the Field of Use specified below," such "field of use" being for use on the surface and not downhole.

F.       **Major's Infringement Concerns and Defendant Denials (January 2024)**

50.   On January 22, 2024, Major's counsel Paul Simon wrote[21] to Mr. Knobloch alleging Mr. Knobloch's infringement (with Tri-Trap and BTK) of the Romero Patents.  Counsel for Mr. Knobloch and BTK responded[22] on January 30, 2024 "specifically and emphatically deny[ing] infringing any patents including, without limitation, the patents listed" in Major's correspondence. Although Mr. Simon's letter referenced only Major's "exclusive rights" to the Romero Patents,

---

[19] Consent of WellX's Managers dated September 28, 2022 attached as Exhibit S.

[20] Attached as Exhibit T.

[21] Attached as Exhibit U.

[22] Attached as Exhibit V.

**ORIGINAL COMPLAINT**

Mr. Knobloch and BTK's response read that claim as both to ownership (which Mr. Simon did not assert) and to the Exclusive Supply Agreement, ignoring WellX's licensure of the Romero Patents (along with "all other diffuser and filtering technology and systems") to Major, and Major's consequent interest in their enforcement.

51. Mr. Knobloch and BTK's response affirmatively asserted that they "voluntarily discussed the skid-based [i.e., surface] filtration business with WellX management… [who] had no interest in pursuing the opportunity or investing the capital necessary to do so, and expressly rejected the idea of pursuing the business." In fact, Mr. Knobloch had previously discussed with Cambre Romero, before WellX's broad License Agreement to Major, the fact that no one but WellX could develop or market iTrap technology without WellX's approval. Mr. Knobloch's response to Mr. Simon does not suggest why Mr. Knobloch or BTK (organized three days after the WellX merger) otherwise would have awaited WellX's refusal to pursue or invest in the "skid-based filtration business" before doing so themselves.

52. But Mr. Knobloch himself did. Before his counsel could do so, Mr. Knobloch wrote[23] to Mr. Simon reiterating the account that WellX had "no interest" in the skid-mounted HPDU system - i.e. iTrap - and that he had therefore "made the decision to move forward individually to fulfill" the Halliburton work obtained, for WellX, with iTrap. Presenting iTrap's promise to WellX, Mr. Knobloch wrote, had merely been "the right thing to do" – before appropriating WellX's iTrap for himself. Mr. Knobloch further represented that development of iTrap was at his own expense, despite the initial engineering development work undertaken at WellX's cost; and was done with "zero affiliation with WellX," despite months of effort having been spent to develop the technology with the Romero brothers, Major, and WellX's engineering firm (explicitly acting

---

[23] Attached as Exhibit W.

on behalf of WellX or its wholly-owned subsidiary, Mason) and then to market iTrap as a surface solution of WellX to WellX's customers – effort Mr. Knobloch spent on WellX's time while being reimbursed by WellX for marketing expenses (including dinners with those customers about iTrap), and using WellX's name.

53.    In fact, these were not personal investments by Mr. Knobloch. He was required by WellX, as communicated to him by Mr. Domingue, to do so, to pay some of WellX's engineering costs for iClean (and some engineering and all the initial manufacturing costs for iTrap) to avoid termination and expulsion from the company after his misconduct caused Halliburton to audit WellX and ultimately cost WellX a significant part of the business of Halliburton (when that relationship was to have been Mr. Knobloch's main contribution to WellX). Even then, Mr. Domingue complained[24] about Mr. Knobloch failing to fully pay for those charges and wanted him "gone" – again, because Mr. Knobloch only was doing the minimum he was required to do for and on behalf of WellX, not as a personal project or investment.

54.    Mr. Knobloch's January 23, 2024 email to Mr. Simon continued well beyond simply denying infringement of the Romero Patents. Instead of using WellX's technology and practicing the Romero Patents, Mr. Knobloch wrote, he had "taken on an additional equity partner"[25] to "design [and] construct a novel, patentable skid package, filter and insert options," including a "system to allow emergency by-pass should [filters] quickly become full."  This apparently referred to the emergency-bypass and "smart" screens that were part of WellX's iTrap XL – and explicitly bore WellX's name when developed by and for WellX by Gonsoulin Engineering, which

---

[24] Text messages between Stephen Domingue and Cambre Romero, August and October 2022, attached as Exhibit X.

[25] Presumably referring to Tri-State and the Carters.

**ORIGINAL COMPLAINT**

had delivered drawings of that product to WellX in December 2022.

55.    Mr. Knobloch further claimed that his "filters do not use the diffuser concept," apparently unaware that WellX had licensed along with the Romero Patents "all other diffuser and filtering technology and systems" of WellX for surface use, both those contributed by Mason and those developed by WellX personnel - including Mr. Knobloch.

56.    Mr. Knobloch did not explain why he believed he was entitled to practice the WellX iTrap technology, Mason's iClean technology, the Romero Patents, or any other "diffuser and filtering technology and systems" developed by WellX (all in contravention of Major's license from WellX), merely because (he claimed) WellX had declined to pursue that business opportunity. Even had WellX not already licensed that technology to Major, Mr. Knobloch would not have been permitted to take it for himself.

57.    Mr. Knobloch hinted that he knew this, seeking to demonstrate to Mr. Simon that his (or BTK's, or Tri-Trap's, or Tri-State's) technology "has 'standard' stabilizers, not diffuser blades, used for centralization," even declaring that the diffusers manufactured by Major for WellX but (apparently) in Tri-State's possession could be returned if desired.

## G.    Concealment of Infringement and State-court Suit

58.    Despite suspecting Defendants' practice of, at least, the Romero Patents sufficient to prompt Mr. Simon's letter, Major lacked certainty as to the scope of Mr. Knobloch's activities.  In the following months, despite Mr. Knobloch's efforts to conceal them, those activities became more clear (as would that concealment itself).

**ORIGINAL COMPLAINT**

59. On May 8, 2024 Mr. Stelly sent[26] (using a Tri-State email address) to Stabil Drill an iTrap XL slide deck including among its features "magnets and diffuser blade inserts" - text that was not previously controversial, given that iTrap XL was a WellX product implementing aspects of the Romero Patents, including magnetic and bladed diffuser inserts.

60. Mr. Knobloch was copied on Mr. Stelly's initial send, and would have been aware that promoting "diffuser blade inserts" directly contradicted his own claims to non-infringement. Incredibly then, Mr. Stelly attempted 17 minutes later to "recall"[27] that message - and then, less than an hour later, to re-send it including the same iTrap XL slide deck, apparently identical *except for deletion of the inculpatory "diffuser blade inserts" language*.

61. Merely deleting the offending language does not change the reality that the product being marketed did actually use WellX technology and infringe the Romero Patents. The altered marketing material provided when the email was re-sent is not exculpatory but evidence of Mr. Knobloch's knowledge and deceptive intent, his intent to conceal his infringement by misleading or lying about his product offering rather than changing the product offering itself.

62. In October 2024, Mr. Knobloch supplied[28] to WellX customer Drilling Tools International a slide deck for a skid-mounted iTrap system, the materials now stripped of their prior mentions of "diffusers" and "blades" - including warnings that the iTrap materials (from which WellX branding had been removed) were "*confidential and privileged information*." Mr. Knobloch did so while discussing "very strong months at WellX Energy" with the customer

---

[26] Each of Mr. Stelly's three communications to Stabil Drill attached as Exhibit Y.

[27] Message recall is a feature available to users of Microsoft Outlook who are within the same organization as their recipient. An attempt to "recall" an email sent to an *external* recipient generates an additional email to that recipient that the sender "would like to recall" the message.

[28] Attached as Exhibit Z.

**ORIGINAL COMPLAINT**

**PAGE 15**

and having WellX pay for his travel to visit this and other customers to whom he was offering infringing iTrap technology without WellX's knowledge or consent.

63.    After efforts to address Mr. Knobloch's activities within WellX (or by WellX) failed, Romero Brother filed suit against SDBK, Mr. Domingue, and WellX itself, derivatively, on September 10, 2025.[29]

64.    Since filing the suit, WellX, through Mr. Domingue and his longtime assistant Susan Badon, has flagrantly, willfully, and repeatedly violated the Exclusive Supply Agreement in retaliation. Mr. Domingue has caused WellX to make equipment purchases from other vendors without justification under, and in violation of, the Exclusive Supply Agreement.

65.    Major's License Agreement assigns to Licensor[30] first right to combat "violation of any of the Intellectual Property[31] and Patents," with Major having that right following WellX's refusal or failure. Undersigned counsel wrote[32] WellX (and its subsidiary and co-Licensor Downhole) on April 9, 2026 enclosing certain materials evidencing activities of Defendants and requesting investigation and action.

66.    WellX did not respond timely (or at all), but Mr. Knobloch and BTK did, calling for specific allegation of their infringement.[33] This action follows.

---

[29] Petition attached as Exhibit AA.

[30] "Licensor" is collectively WellX and Downhole, which remains record assignee of the Romero Patents.

[31] As discussed above, the License Agreement scopes significantly more broadly than only the Romero Patents, to embrace any other of the "diffusion and filtering" technology contributed to WellX by Mason or developed by WellX.

[32] Attached as Exhibit BB.

[33] Attached as Exhibit CC.

**ORIGINAL COMPLAINT**

## IV. CAUSES OF ACTION

**A.      Patent Infringement**

67.    Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

68.    Defendants have been, and/or are now, infringing, contributing to the infringement of, and/or inducing the infringement of, one or more claims of the '181 Patent by making, using, leasing or offering for lease, or selling or offering for sale that which is the claimed subject matter of the '181 Patent without consent either of WellX or of Major, in violation of Major's exclusive rights. Specifically, Defendants are using, offering for sale, or contributing to or inducing the sale, use, or offer for sale or use by others, of diffuser assemblies in violation of at least one claim of the '181 Patent. See infringement analyses in claims charts attached as Exhibit DD.

69.    The infringing activity will continue absent injunction by this Court.

70.    The infringement of the '181 Patent by Defendants is willful, and Plaintiff is accordingly entitled to enhanced damages, pursuant to 35 U.S.C. Sec. 284, in an amount equal to three times the amount found or assessed.

71.    This is an exceptional case such that Defendants should be required to pay Plaintiff's reasonable attorneys' fees in accordance with 35 U.S.C. Sec. 285.

72.    Plaintiff respectfully requests a permanent injunction after trial on the merits.

**B.      Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law**

73.    Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

74.    Defendants engaged in unfair competition with Plaintiff by using confidential,

**ORIGINAL COMPLAINT**

proprietary, business and trade secret information of which Major is the exclusive licensee.

75.    Major seeks damages for continuing misappropriation of confidential and proprietary business information, the misappropriation of which constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

76.    As a result of Defendants' misappropriation, Plaintiff has been injured. In addition to injunctive relief, Plaintiff seeks actual damages caused by and attorney's fees incurred because of Defendants' misappropriation. At this time, Plaintiff's injury is difficult or impossible to calculate; lost sales and revenue are unascertainable at this time as is the extent of Defendants' use of Plaintiff's confidential and proprietary information.

### C.    Violations of the Louisiana Uniform Trade Secrets Act

77.    Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

78.    Under the Louisiana Uniform Trade Secrets Act (LUTSA), actual or threatened misappropriation of trade secrets may be remedied both with injunctive relief and, on showing of actual loss, recovery of such loss. Certain of the confidential and proprietary business information misappropriated and misused by Defendants, as described above, falls within the definition of "trade secret" as that term is defined by La. R.S. 51:1431, entitling Plaintiff to relief both equitable and in damages.

79.    Because at this time the full extent of Defendants' misappropriation of Plaintiff's trade-secret information is not yet known, determination of the extent of Plaintiff's losses awaits discovery. However, Defendants have, as alleged above, engaged in activities that constitute present actual, and threatened future, misappropriation of trade-secret information, entitling

**ORIGINAL COMPLAINT**

**PAGE 18**

Plaintiff to injunctive relief.

**D.      Violations of the Defend Trade Secrets Act**

80.    Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

81.    The federal Defend Trade Secrets Act of 2016, 18 U.S.C. 1836 (DTSA), confers on Plaintiff a cause of action that parallels[34] but does not duplicate its cause under LUTSA: DTSA "shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by… State… law for the misappropriation of a trade secret," 18 U.S.C. 1838. But the DTSA, modeled on the Uniform Trade Secrets Act, provides independent subject-matter jurisdiction, 18 U.S.C. Sec. 1836(c).

82.    The proprietary information employed by Defendants in interstate competition with Plaintiff includes trade secrets under both LUTSA and DTSA.

**E.      Breach of Contract**

83.    Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

84.    WellX had a duty to enforce against Defendants infringement or misappropriation of the rights it granted exclusively to Major, or (in the alternative) to "promptly notify"[35] Major of "any actual, suspected, or threatened infringement, misappropriation, or other violation" of the

---

[34] "… the treatment of trade secrets under the federal Defend Trade Secrets Act and the Louisiana Uniform Trade Secrets Act is nearly identical." *Master Flow Technologies, L.L.C. v. Lee*, 2023-615 (La.App. 3rd Cir. 4/3/24), 386 So.3d 1153, 1161 (FN2).
[35] Exhibit T, License Agreement, Sec. 4.1.

**ORIGINAL COMPLAINT**

licensed technology.

85.    Upon information and belief, WellX, through Mr. Domingue, had (and has) knowledge of Defendant's misappropriation and infringement activities prior to and superior to Major's, and failed its contractual obligation to take enforcement action or, failing that, to notify Major.

Upon information and belief, WellX's failure to enforce the License Agreement (or to notify Major so that the latter could enforce it) resulted in Major losing a large amount of business under the Exclusive Supply Agreement for the manufacture of iTrap assemblies, in violation of WellX's duties and obligations under the Exclusive Supply Agreement and License Agreement. Upon information and belief, WellX, through Mr. Domingue acting to protect the interest of Mr. Knobloch, likewise is directing work unrelated to iTrap away from Major in violation of the Exclusive Supply Agreement.

86.    WellX is further liable to Major in breach of contract for its violations of the Exclusive Supply Agreement committed since the state-court suit against Mr. Domingue was filed, WellX being obligated to compensate Major for all purchases it has directed to other vendors by paying to Major 100% of the revenue Major would have received from those purchases.

## F.    Attorney's Fees

87.    Plaintiff seeks its reasonable costs and attorney's fees from Defendants pursuant to the statutes enumerated above.

## G.    Jury Demand

88.    Plaintiff hereby demands a trial by jury of any and all issues triable of right by a jury.

**ORIGINAL COMPLAINT**

## V.    <u>PRAYER</u>

**Wherefore** Plaintiff, **Major Manufacturing & Supply, L.L.C.**, respectfully requests that, upon final disposition of this matter, a permanent injunction against Defendants be issued. Plaintiff further prays that upon the final disposition of this matter, it be awarded actual damages, treble damages where appropriate and authorized, exemplary damages where appropriate and authorized, its attorneys' fees, costs, expenses, interest, and such other and further relief, at law or in equity, to which it may be justly entitled.

Respectfully submitted,

/s/Ryan Goudelocke
Ryan M. Goudelocke (#30525)
*Goudelocke Law*
220 Heymann Blvd.
Lafayette, Louisiana 70503
Phone: (337) 345-1985
Fax: (337) 233-9095
ryan@goudelocke.law
*Attorney for Plaintiff*

**PLEASE WITHHOLD SERVICE AT THIS TIME**

**ORIGINAL COMPLAINT**

**PAGE 21**